UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                           :

JON E. FLEMING,                                 :
                                           :

                              Plaintiff,    :            12 Civ. 1154 (JPO)
                                           :

                 -against-               :            <u>MEMORANDUM</u>
                                           :            <u>AND ORDER</u>
RICHARD HYMES-ESPOSITO,         :

                                           :

                              Defendant.    :
                                           :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

        Jon E. Fleming filed this action against Richard Hymes-Esposito for breach of contract,

promissory estoppel, fraud, breach of the covenant of good faith and fair dealing, defamation,

intentional infliction of emotional distress, and tortious interference with contractual relations

and prospective economic advantage.  Hymes-Esposito filed an Answer with Counterclaims,

which he later amended.

        Before the Court are cross-motions to dismiss.  Fleming also moves for the imposition of

Rule 11 sanctions against Hymes-Esposito and his attorney.  For the reasons set forth below,

Fleming's Motion to Dismiss the Counterclaims is granted in part and denied in part; Hymes-

Esposito's Motion to Dismiss the Complaint is granted in part and denied in part; and Fleming's

Motion for the Imposition of Rule 11 Sanctions is denied.

**I.      Background**

      **A.      Factual Background**

            **1.      Allegations in the Complaint**[1]

Fleming lived in Beverly Hills, California prior to November 2011 and remains a resident of California.  He is an actor and model who has appeared in several television shows and films.  Hymes-Esposito, a theatrical actor and producer, is a resident of New York.

Hymes-Esposito contacted Fleming in or about October 2011 to offer him the starring role in *HIM*, a play written by Clifford Streit ("Streit").  Streit had previously granted Hymes-Esposito the right to produce *HIM* in a letter dated October 1, 2011.

In or about late October 2011, Fleming and Hymes-Esposito entered into an agreement (the "Agreement")[2] whereby Fleming would come to New York City to star in *HIM* and in return, Hymes-Esposito would pay Fleming $1,000 per week during the play's run and provide Fleming with housing accommodations at an apartment (the "Apartment") until at least May 1, 2012.  Hymes-Esposito also agreed, contingent upon the success of the first run, to finance a second run of *HIM*; to continue to pay Fleming $1,000 per week; and to provide Fleming with accommodations at the Apartment.  Additionally, if Hymes-Esposito financed a second run of *HIM* as per the Agreement, he agreed to pay Fleming 20-percent of its profits.

Fleming subleased his apartment in Beverly Hills and flew to New York City on a flight paid for by Hymes-Esposito.  In order to come to New York City, Fleming canceled auditions already scheduled by his agents at Momentum Talent.

---

[1] The facts taken from the Complaint are presumed true for purposes of Hymes-Esposito's motion to dismiss.

[2] The Agreement was not reduced to a signed writing.  Instead, Fleming alleges that the two parties reached the terms of the agreement orally as well as through text message and emails.

Hymes-Esposito paid Fleming the agreed-upon salary and provided him accommodations at the Apartment in November and December 2011.  Hymes-Esposito also paid for approximately half the total production costs of *HIM*.

Hymes-Esposito began exhibiting erratic behavior which caused disputes between him and the cast, crew, and co-producer of *HIM*.  On or about December 15, 2011, Hymes-Esposito suddenly refused to continue financing *HIM* and to pay Fleming any additional money.  Hymes-Esposito also told the public and the cast and crew that Fleming was going to quit *HIM* and would not be returning for future runs.  From December 2011 to January 2012, after *HIM* debuted, Hymes-Esposito left for Hawaii without providing any more funding for *HIM*.  Streit stepped in to provide the rest of the funding necessary to open *HIM* and also agreed to pay Fleming's $1,000 per week salary.

In December 2011, Hymes-Esposito stated, in a text message sent to Streit, that he would house Fleming after *HIM*'s run "on my dollar, for the next 2 months" and that Fleming could stay in the Apartment until March 8, 2012.  (Compl. at ¶ 34.)  In an email sent on December 30, 2011, Hymes-Esposito again stated that he would house Fleming "for the next 2 months."  (*Id.*)

*HIM* was an instant hit and sold out for the entirety of its run which, as scheduled, ended on January 6, 2012.  Soon thereafter, Hymes-Esposito returned to New York City.  He declined, however, to finance a second run of *HIM*, to pay Fleming the agreed-to salary and percentage of profits, or to continue to provide Fleming with housing accommodations at the Apartment. Hymes-Esposito's last payment to Fleming was on January 8, 2012.[3]

---

[3] It is unclear from the Complaint how many salary payments Hymes-Esposito made to Fleming. Fleming states that Hymes-Esposito paid the salary "for November and December 2011." However, Fleming also states that Hymes-Esposito failed to pay the salary "from on or about November 1, 2011 to on or about January 6, 2012."

Due to his purported reprise in *HIM*, Fleming was in New York, rather than Los Angeles, during pilot casting season and asked Streit, in a January 15, 2012 text message, to inform Hymes-Esposito that "if he [Hymes-Esposito] did not intend to pay me that [sic] he should have had a flight booked for me on the 8th [of January] so I could make money and audition." (*Id.* at ¶¶ 37, 38.)  Fleming, however, had little to no audition opportunities at that late date.  Knowing this, Hymes-Esposito pressured Fleming to instead act in a play Hymes-Esposito had written entitled *Jose Santiago*.  Hymes-Esposito further told Fleming that he would cease paying Fleming's salary or providing him with accommodations at the Apartment unless Fleming agreed to act in *Jose Santiago*.

Hymes-Esposito then began to harass Fleming via telephone, appear unexpectedly at the Apartment, and send individuals to the Apartment to induce Fleming to leave.  Hymes-Esposito also spread rumors that Fleming was quitting *HIM*.[4]  On or about January 31, 2012, Hymes-Esposito entered the Apartment without Fleming's permission and, when Fleming came home, refused to leave until Fleming called the police.

Finally, in February 2012, Fleming left the Apartment and returned to his parents' home in Wisconsin.

      **2.**        **Allegations in the Amended Counterclaim**[5]

In organizing the production of *HIM*, both Fleming and Streit recognized Hymes-Esposito as a "potential producer, investor and 'angel'" for *HIM*.  (Am. Countercl. ¶ 2.)  Thus,

---

[4] It is unclear from the Complaint at what time Fleming alleges Hymes-Esposito began falsely telling others that Fleming was quitting *HIM*.  The Complaint states both that this began in December 2011, while *HIM*'s first run was still ongoing, and that this began after the run ended in January 2012.

[5] For the purposes of Fleming's Motion to Dismiss the Amended Counterclaim, the allegations in the Amended Complaint are presumed true.

Hymes-Esposito entered into an Agreement with Fleming, by which he agreed to pay Fleming $6,000 for the show's six-week run.  Hymes-Esposito also agreed to provide Fleming accommodations at the Apartment until the end of its run on January 8, 2012.  Hymes-Esposito invested over $80,000 to finance the first run of *HIM*, losing over $70,000 due to the play's lack of success and failure to make any profit.  (Affidavit of Hymes-Esposito, Dkt. No. 25 ("Def.'s Aff."), at ¶¶ 3, 18.)

Fleming nevertheless took advantage of Hymes-Esposito's generosity by demanding additional sums of money.  Fleming and Streit caused Hymes-Esposito to expend over $80,000 on the production of *HIM*, which constituted full financing of the show, except for the casting director's fee, publicist's fee and Manhattan Rehearsal space fee.  Fleming and Streit eventually squeezed Hymes-Esposito out as *HIM*'s producer.  *HIM* ended its run on January 8, 2012. Fleming, however, did not leave the Apartment until February 1, 2012, staying approximately 22 days longer than permitted under the parties' Agreement.

### B.    Procedural Background

Fleming filed the Complaint and Jury Demand in this action on February 14, 2012.  (Dkt. No. 1.)  Esposito filed the Verified Answer with Counterclaim on March 13, 2012.  (Dkt. No. 4.) On March 19, 2012, Fleming's attorney wrote to Hymes-Esposito's attorney and asked for voluntary dismissal of the Counterclaim, warning that he would otherwise seek imposition of Rule 11 sanctions.  Hymes-Esposito then filed the Amended Verified Answer with Amended Counterclaim on April 6, 2012.  (Dkt. No. 11.)  Fleming filed the Motion to Dismiss the Amended Counterclaim on April 24, 2012 and the Motion for Rule 11 Sanctions on April 26, 2012.  (Dkt. Nos. 12, 18.)  Hymes-Esposito terminated attorney David L. Ganz on April 27, 2012

and substituted, with the court's consent, attorney Murray Shactman.  (Dkt. No. 21.)  Hymes-Esposito filed his Cross-Motion to Dismiss the Complaint on June 5, 2012.  (Dkt. No. 24.)

## II.     Motion to Dismiss Standard

In order to survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Where a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Twombly*, 550 U.S. at 570.  The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor."  *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006) (internal quotations omitted).  On the other hand, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. 662 at 678; *see also Twombly*, 550 U.S. at 555 (noting that a court is "not bound to accept as true a legal conclusion couched as a factual allegation." (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986))).

"While the rules of pleading in federal court usually require only 'a short and plain statement' of the plaintiff's claim for relief, averments of fraud must be 'state[d] with particularity.'"  *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 524 (S.D.N.Y. 2009) (quoting Fed. R. Civ. P. 8, 9(b) (alteration in original)).  "In order to satisfy Rule 9(b), the plaintiff must: '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify

6

the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 332 (S.D.N.Y. 2009) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). The requirements of Rule 9(b) are, in part, designed to give a defendant "fair notice of a plaintiff's claim." *Id.*

## III.   Discussion

### A.   Fleming's Claims

In his Complaint, Fleming asserts claims for (1) breach of contract; (2) tortious interference with contract and tortious interference with prospective economic advantage; (3); (4) fraud; (5) defamation; (6) intentional infliction of emotional distress; (7) promissory estoppel; and (8) breach of the covenant of good faith and fair dealing. Hymes-Esposito has moved to dismiss Fleming's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that (1) there was no meeting of the minds as to Fleming's alleged contract; (2) the contract damages alleged are speculative; (3) the allegations do not reflect that Fleming was defrauded; (4) the alleged defamatory statement did not rise to the level of an actionable claim; and (5) the putative intentional infliction of emotional distress was not outrageous in character.[6]

#### 1.      Breach of Contract

"Under New York law, the elements of a breach of contract claim are (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." *Swan Media Group, Inc. v. Staub*, 841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012) (citation omitted). A sufficient pleading for breach of contract must, "at a

---

[6] Hymes-Esposito does not address Fleming's claims for promissory estoppel or breach of the covenant of good faith and fair dealing; accordingly, those claims survive Hymes-Esposito's motion to dismiss.

minimum, allege the terms of the contract, each element of the alleged breach and the resultant damages in a plain and simple fashion." *Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F. Supp. 276, 286 (S.D.N.Y. 1991) (citation omitted); *accord Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) ("To make out a viable claim for breach of contract a 'complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).  Contracts need not be written to constitute enforceable agreements; while oral arrangements can indeed give rise to enforceable agreements, a plaintiff nevertheless "faces a heavier burden when trying to prove an alleged oral contract." *Cleveland Wrecking Co. v. Hercules Const. Corp.*, 23 F. Supp. 2d 287, 293 (E.D.N.Y. 1998) (citation omitted).

Fleming has satisfied the minimum requirements necessary to plead a breach of contract claim.  Fleming has pleaded the existence of a contract with Hymes-Esposito and its terms, namely that Fleming would move to New York and star in *HIM* and in return that Hymes-Esposito would pay him a salary of $1,000 per week and provide him with housing accommodations at the Apartment.  Fleming has also pleaded that the Agreement included the promise by Hymes-Esposito to finance a second run of *HIM* if the first run was a success and, if so, to continue providing the salary and accommodations as well as a payment of 20% of the second run's profits.  Additionally, the Complaint reflects the allegation of a breach: that Hymes-Esposito refused to finance a second run of *HIM*, despite the first run's success.  Moreover, Fleming describes damages resulting from this breach; to wit, the loss of his salary, housing accommodations, 20-percent bonus he was promised for the second run, and casting opportunities in Los Angeles.  Fleming also alleges that he complied with all stated terms of the

8

agreement between Fleming and Hymes-Esposito, making out the final element of a claim for breach of contract under New York law.

Hymes-Esposito contends that the Agreement is too ambiguous to demonstrate the parties' intent to be bound.  For example, he points to the Agreement's use of the undefined term "success."  It is true that, in New York, "[t]o establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound."  *Kowalchuk v. Stroup*, 61 A.D.3d 118, 121 (1st Dep't 2009).  The question of whether the parties did in fact exhibit such intent is a factual question and not one warranting dismissal on the pleadings.  *See Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 439-40 (S.D.N.Y. 2003) ("[I]n cases where the intent to be bound is not conclusively determinable based on the facts alleged in the complaint and the documents incorporated by reference, 'the issue of whether and when the parties intended to be bound is a factual issue that should [be] submitted to the jury.'" (quoting *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 593 (2d Cir. 1996))).  The alleged ambiguity of the term "success," by itself, does not necessitate dismissal of Fleming's breach of contract claim.  The Complaint adequately states a claim for breach of contract.

### 2. Tortious Interference with Contractual Relations and Tortious Interference with Prospective Economic Advantage

Under New York law, to state a claim for tortious interference with contractual relations, a plaintiff must plead: "(i) the existence of a valid contract between the plaintiff and a third party; (ii) defendant's knowledge of the contract; (iii) defendant's intentional inducement of the third party to breach the contract; (iv) and damages."  *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 497 (S.D.N.Y. 2002) (citation omitted).

9

Fleming's claim for tortious interference with contractual relations fails as a matter of law.  Fleming does plead the existence of a valid contract with Momentum Talent and alleges that, because of Hymes-Esposito's actions, he missed casting opportunities Momentum Talent had scheduled for him; however, nowhere in the Complaint does Fleming allege that Momentum Talent breached the contract and that this breach was induced by Hymes-Esposito.  Fleming's claim for tortious interference with contractual relations is therefore dismissed.  As for Fleming's claim for tortious interference with prospective economic advantage, in New York, "[t]ortious interference with prospective business advantage requires 'more culpable conduct on the part of the defendant' than tortious interference with contractual relations."  *Wolff*, 210 F. Supp. 2d at 500 (quoting *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.*, 87 N.Y.2d 614, 621 (1996)).  And here, Fleming has failed to allege even a claim for tortious interference with contract.  Accordingly, Fleming's claim for tortious interference with prospective business advantage is also dismissed.

### 3.    Fraud

"Under New York law, in order to sustain a claim for fraud, a plaintiff must adequately establish each of five fundamental elements, namely: (1) representation of a material fact; (2) falsity; (3) scienter; (4) reasonabl[e] reliance; and (5) injury."  *Koch v. Greenberg*, No. 07 Civ. 9600, 2008 WL 4778813, at *6 (S.D.N.Y. Oct. 31, 2008) (citation omitted).  Fraud claims are subject to Rule 9(b), and must be pleaded with particularity.  *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009).

In New York, "a plaintiff cannot transform a contract claim into a fraud claim simply by alleging that the defendant 'entered the . . . agreement while intending not to perform it.'"  *GEM*, 667 F. Supp. 2d at 330 (quoting *Nash v. The New School*, No. 05 Civ. 7174, 2009 WL 1159166,

at *3 (S.D.N.Y. Apr. 29, 2009) (internal quotations omitted)); *see also Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 19-20 (2d Cir. 1996) ("[The] facts amount to little more than intentionally-false statements by Beladino indicating his intent to perform under the contract.  That is not sufficient to support a claim of fraud under New York law." (citing *McKernin v. Fanny Farmer Candy Shops, Inc.*, 176 A.D.2d 233, 234, 574 N.Y.S.2d 58, 59 (2d Dep't 1991) ("[W]here, as here, a claim to recover damages for fraud is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie."))).  Thus, where fraud seemingly stems from an alleged contract, a plaintiff may maintain the fraud claim only if either: (1) he "demonstrate[s] a legal duty separate from the duty to perform under the contract," or (2) he "demonstrate[s] a fraudulent misrepresentation collateral or extraneous to the contract."  *Bridgestone/Firestone*, 98 F.3d at 20 (internal quotations and citations omitted).

Here, the Complaint alleges that "[Hymes-Esposito] fraudulently induced [Fleming] to enter into this Agreement by actively concealing material information, namely, that [Hymes-Esposito] wanted [Fleming] to come to New York to act in [Hymes-Esposito]'s play[,]" and that the "intended result of [Hymes-Esposito]'s promises was to have [Fleming] re-locate to New York, New York and then refuse to pay [Fleming] or provide him accommodations . . . unless [Fleming] agreed to star in [Hymes-Esposito]'s play."  Fleming further alleges that he would not have entered into the agreement to move to New York and star in *HIM*, forgoing pilot casting season in Los Angeles, had he known of Hymes-Esposito's true plans to induce Fleming to star in *Jose Santiago*.

11

These pleadings fail to satisfy Rule 9(b).  First, Fleming does not specify "the time and place of each such statement and the persons responsible for making (or, in the case of omissions, for not making) each such statement," *GSGSB, Inc. v. New York Yankees*, 862 F. Supp. 1160, 1177 (S.D.N.Y. 1994), instead alleging only that Hymes-Esposito failed to state his true plans in order to induce Fleming into the Agreement.  Even presuming that this omission occurred when the two parties entered into the Agreement "[i]n or about late October 2011" (Compl. ¶ 19), the allegation nevertheless fails to define time and place with particularity.  Furthermore, Fleming does not claim that Hymes-Esposito benefited from the alleged fraud.  The alleged purpose of Fleming's fraud was to force Fleming to star in *Jose Santiago*, yet Fleming does not allege that this plan succeeded or that Hymes-Esposito otherwise benefitted from the fraud.[7]

Fleming's fraud allegation is simply an "attempt to convert [a] breach of contract action[] into [a] fraud claim[]," *GSGSB, Inc.*, 862 F. Supp. at 1177, as the allegations state no facts that are genuinely separate from the breach of contract claim, except that Hymes-Esposito never intended to abide by the Agreement.  This claim therefore falls squarely into the well-established rule that "[a] cause of action for fraud does not generally lie where the plaintiff alleges only that the defendant entered into a contract with no intention of performing."  *Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 434 (2d Cir. 1995) (citation omitted).  Moreover, Fleming has failed to demonstrate a legal duty apart from that asserted in his contract claim, nor has he pleaded the existence of a collateral or extraneous misrepresentation, as required under New York law.  Thus, Fleming's fraud claim is inextricably linked to his claim for breach of contract,

---

[7] To the contrary, Fleming states that Hymes-Esposito paid for Fleming's airline ticket, part of *HIM*'s production costs and Fleming's salary, and that he gave Fleming use of the Apartment for a period – yet he never convinced Fleming to star in *Jose Santiago*.

and cannot stand apart.  *But see GEM*, 667 F. Supp. 2d at 330-31 ("Where the claim for the fraud is sufficiently separate from the claim for breach of contract, however, the fraud claim can stand. . . . In this case, Plaintiff adequately alleges a fraudulent misrepresentation that is separate and apart from the promise to perform under the contract.").

>    4.    **Defamation**

>    a.    **Sufficiency of Fleming's Pleading of a Claim for Defamation**

"Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander."  *Idema v. Wager*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) (citation omitted).  Under New York Law, in order to state a defamation claim for slander, a Plaintiff must allege the following: "(1) a false statement about the [Plaintiff]; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'"  And a statement is defamatory *per se* if it "tend[s] to injure another in his or her trade, business or profession."  *Fuji Photo Film*, 669 F. Supp. 2d at 411 (quoting *Stern v. Cosby*, 645 F. Supp. 2d 258, 273 (S.D.N.Y. 2009) (quotations omitted)).  To survive a motion to dismiss a defamation claim, a plaintiff must, at a minimum, "identif[y] the purported communication, and [indicate] who made the communication, when it was made, and to whom it was communicated."  *Prowley v. Hemar Ins. Corp. of Am.*, No. 05 Civ. 981, 2010 WL 1848222, at *6 (S.D.N.Y. May 7, 2010) (quoting *Scholastic, Inc. v. Stouffer*, 124 F. Supp. 2d 836, 849 (S.D.N.Y. 2000)); *accord Thai v. Cayre Group Ltd.*, 726 F. Supp. 2d 323, 329-30 (S.D.N.Y. 2010).

Fleming alleges that Hymes-Esposito told the general public that Fleming was quitting *HIM* and would not be returning for future runs.  Fleming contends that these statements were

13

false and were made with knowledge of their falsity or reckless disregard for their truth or

falsity, thus satisfying the first element of a defamation claim.  The Complaint identifies the

instances wherein Hymes-Esposito allegedly made these statements and the individuals to whom

the statements were made.  The Complaint also states, more specifically, that Hymes-Esposito

told Charles Casano around January 16, 2012, and Roxi Sorina around January 26, 2012, that

Fleming was not returning to *HIM*.  (*Id.* at ¶ 76.)  Fleming asserts that his professional reputation

has suffered as a consequence of these statements, as Hymes-Esposito's claims have branded

him as an unreliable, irresponsible, and dishonest actor.  Fleming also contends that as a result of

Hymes-Esposito's statements, his "reliability has been questioned publicly" and that ticket sales

for the second run of *HIM* dropped.  (*Id.* at ¶ 81.)

     Fleming's allegations place his defamation claim within the scope of slander *per se*, as

each of the alleged statements at issue relate to Fleming's "trade, business, or profession."  *Fuji*

*Photo Film U.S.A.*, 669 F. Supp. at 411; *see also Liberman v. Gelstein*, 80 N.Y.2d 429, 435, 605

N.E.2d 344 (Ct. App. 1992) ("The four established exceptions (collectively "slander per se")

consist of statements (i) charging plaintiff with a serious crime; (ii) that tend to injure another in

his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv)

imputing unchastity to a woman.").  Admittedly, the "trade, business or profession" exception is

narrow, and "limited to defamation of a kind incompatible with the proper conduct of the

business, trade, profession or office itself," meaning "[t]he statement must be made with

reference to a matter of significance and importance for that purpose, rather than a more general

reflection upon the plaintiff's character or qualities."  *Liberman*, 80 N.Y.2d at 436; *see also*

*Casper v. Lew Lieberbaum & Co., Inc.*, No. 97 Civ. 3016, 1998 WL 150993, at *9 (S.D.N.Y.

Jan. 11, 2010) (citation omitted).  The alleged statements here, however—that Fleming (1) had

14

backed out of an acting job; (2) was an unreliable actor; and (3) reneged on acting responsibilities—go to the core of a stage professional's ability to work in the industry. *Cf. Protic v. Dengler*, 46 F. Supp. 2d 277, 280-81 (S.D.N.Y. 1999), *aff'd*, 205 F.3d 1324 (2d Cir. 1999) (noting that certain oral statements that Plaintiff (1) "deserved a negative job reference"; (2) had performed "unsatisfactory work"; and (3) was "not competent to perform the duties of a securities trader[,]" "reflected directly on [Plaintiff's] fitness to perform the duties of his profession and therefore were slanderous *per se*").

Notably, in New York, "a statement of opinion will not give rise to liability for defamation"; such a statement constitutes one of opinion if "(1) the language lacks a readily understood meaning, (2) it is incapable of being proven false, and (3) the text or social context signals to the audience that the statement is one of opinion rather than of fact." *Id.* at 281 (footnotes omitted). While statements as to an individual's reliability likely constitute non-actionable opinion, *see, e.g.*, *id.* at 281 (holding statements as to the "unsatisfactory" nature of Plaintiff's work to be opinion), Hymes-Esposito's contention that Fleming was quitting *HIM* is capable of being proven false. Moreover, this allegation sounds in fact, not opinion, and is readily understood. Accordingly, Fleming's allegation that Defendant falsely told industry representatives, together with specific individuals, that Fleming was quitting the play in which Fleming starred constitutes slander *per se*.

### b.    Qualified Privilege

Hymes-Esposito contends that Fleming's defamation claim must be dismissed because, "Hymes-Esposito made those statements to members of the production," which places them within the qualified privilege of statements made by an employer to an employee. (Def.'s Mem. 7.) Put another way, Hymes-Esposito argues that, as producer of *HIM*, he enjoyed a qualified

15

privilege to communicate what could otherwise be defamatory statements about Fleming to his employees.

"Qualified privilege is a defense to claims of slander," and refers to "[g]ood faith communications of a party having an interest in the subject, or a moral or societal duty to speak, are protected by a qualified privilege if made to a party having a corresponding interest or duty." *Boyd v. Nationwide Mut. Ins. Co.*, 208 F.3d 406, 409-10 (2d Cir. 2000) (quotations and citation omitted). A qualified privilege creates a "rebuttable presumption of good faith that may constitute a complete defense." *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 62 (2d Cir. 1993). A plaintiff may rebut this presumption by showing "two things: (1) that the statement was false, and (2) that the defendant abused its qualified privilege." *Id.* (internal citations omitted).

Here, Hymes-Esposito fails to establish that the dismissal of Fleming's defamation claim is warranted on the basis of qualified privilege. As discussed above, a plaintiff can overcome a claim of qualified privilege in a defamation action by showing that the defendant "act[ed] with common law malice, or act[ed] with 'knowledge that the statement was false or with a reckless disregard as to its truth.'" *Boyd*, 208 F.3d at 410 (quoting *Weldy*, 985 F.2d at 62). Fleming contends that Hymes-Esposito acted with malice in making the defamatory statements: namely, that Hymes-Esposito knew these statements were false or recklessly disregarded whether they were true or false. Fleming also alleges that Hymes-Esposito made the statements in the hope that they would compel Fleming to act in Hymes-Esposito's own play, *Jose Santiago*. These allegations are sufficient to overcome Hymes-Esposito's invocation of qualified privilege at the pleadings stage. Accordingly, Fleming's defamation claim survives the motion to dismiss.

###### 5.        Intentional Infliction of Emotional Distress

Under New York Law, a plaintiff alleging intentional infliction of emotional distress must state four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress."  *Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121, 612 N.E.2d 699 (Ct. App. 1993).  These requirements are exceedingly difficult to satisfy, as the tort refers to conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 303, 448 N.E.2d 86 (Ct. App. 1983).  "Indeed, of the intentional infliction of emotional distress claims considered by [the New York Court of Appeals], every one has failed because the alleged conduct was not sufficiently outrageous."  *Howell*, 81 N.Y.2d at 122; *accord Leibowitz v. Bank Leumi Trust Co.*, 152 A.D.2d 169, 171, 548 N.Y.S.2d 513 (2d Dep't 1989) (upholding dismissal of intentional infliction of emotional distress claim where Plaintiff had been repeatedly subjected to religious slurs and noting that while the "occasional use of such derogatory and demeaning remarks reflects a certain level of narrowmindedness and meanspiritedness, this is not a case 'where severe mental pain or anguish [was] inflicted through a deliberate and malicious campaign of harassment or intimidation'" (quoting *Nader v. General Motors Corp.*, 25 N.Y.2d 560, 569, 255 N.E.2d 765 (Ct. App. 1970)) (alteration in original); *Seltzer v. Bayer*, 272 A.D.2d 263, 265, 709 N.Y.S.2d 21 (1st Dep't 2000) (holding that the defendant's alleged dumping of a pile of cement, tossing of lighted cigarettes, and drawing of a swastika on his neighbor's house did not constitute conduct sufficiently outrageous to survive a motion for summary judgment).

Fleming has failed to plead conduct of a sufficiently extreme and outrageous nature to state a

claim.  He alleges that Hymes-Esposito threatened and harassed him; he points, however, to only

the alleged defamation, Hymes-Esposito's numerous phone calls, and Hymes-Esposito's

unannounced visits to the Apartment (and his refusal to leave after one particular visit).  These

allegations are insufficient, as they fail to plead conduct that is "extreme and outrageous," as a

matter of law.   Accordingly, Fleming's claim for intentional infliction of emotional distress must

be dismissed.

### B.      Hymes-Esposito's Claims

Hymes-Esposito asserts counterclaims for (1) breach of contract; (2) tortious interference

with contractual rights; (3) conspiracy; and (4) extortion.

### 1.      Breach of Contract

Hymes-Esposito's first counterclaim is one for breach of contract.[8]  As discussed above,

for a claimant to successfully plead a claim for breach of contract, he must allege the existence of

a contract, its terms, a breach, and resulting damages.

Hymes-Esposito satisfies these minimum pleading requirements.  The Counterclaim

alleges that Fleming "breached his oral contract with [Hymes-Esposito] and owes him as a result

for his failure to vacate [the Apartment] on the close of the show not less than $133 a day

(totaling more than $2,926)."  (Am. Countercl. ¶ 12.)  The Counterclaim also alleges that the

---

[8] Hymes-Esposito later characterizes this counterclaim as one for use and occupancy.  Under
New York law, "[a] former tenant or other occupant who adversely remains in possession of
space is liable to the owner or lessor for the payment of the reasonable value of the premises.
This sum is customarily known as 'use and occupancy.'"  F N.Y. Prac, Landlord and Tenant
Practice in New York § 8:47.  "Use and occupancy differs from rent in that the former arises
upon a lease's expiration, termination, or in the absence of an agreement as to the sums due."  *Id.*
at § 8:48.  Here, Hymes-Esposito alleges that Fleming stayed in the Apartment past the date
allowed under the Agreement and is liable for the "rent or equivalent."  (Am. Countercl. ¶ 9.)  At
this stage, this is sufficient to plead damages in the form of use and occupancy.

show ended on January 8, 2012,[9] but that Fleming did not vacate the Apartment until February 1, 2012, which constituted a breach of the oral agreement.  The Counterclaim further contends that Hymes-Esposito agreed to pay Fleming $6,000, but that Fleming caused Hymes-Esposito to pay him cash in excess of this Agreement (over $10,000); Hymes-Esposito demands reimbursement of the excess amount.  Hymes-Esposito has therefore pleaded the existence of a contract for salary and use of the Apartment, the terms of this contract, breach of the contract by Fleming, and resulting damages.  Thus, Hymes-Esposito's breach of contract claim survives.

### 2.      Tortious Interference with Contractual Rights

As discussed above, a claimant must assert the following in order to state a claim for tortious interference with contractual rights:  the existence of a contract between him or herself and a third party; the claim defendant's knowledge of the contract; the claim defendant's intentional procurement of a breach of the contract; and resulting damages.

Hymes-Esposito has failed to state a claim under these requirements.  As Fleming correctly notes in his brief, "Hymes-Esposito fails to allege any facts showing a valid contract between him and a third-party."  (Pl. Mem. 9.)  In claiming that Fleming has tortiously interfered with his contractual relations, Hymes-Esposito appears to be referring to a contract between himself and Streit.  However, Hymes-Esposito does not actually plead the existence of a contract with Streit, nor does he allege that Fleming knew of this contract and induced its breach by Streit causing damages.  Hymes-Esposito's claim for tortious interference with contractual relations is therefore dismissed.

---

[9] The Amended Answer with Amended Counterclaim actually reads "January 8, 2011" and "February 1, 2011" (Am. Countercl. ¶ 9), but this Court assumes that these are simply typos as to the year.

### 3.      Conspiracy; Extortion

Although he does not specifically enumerate them as counterclaims, Hymes-Esposito also alleges that Fleming and Streit engaged in conspiracy and extortion.  The Amended Counterclaim alleges that Fleming "generally took advantage of [Hymes-Esposito] over an extended period of time, eventually being part of the plan or conspiracy to extort or cause [Hymes-Esposito] to expend serious money on their [Fleming and Streit's] scheme or plan." (Am. Countercl. ¶ 7.)  This allegation stems from Hymes-Esposito's assertion that Fleming and Streit unjustly caused him to expend money on the production of *HIM* and then "squeezed him out."  (*Id.* at ¶ 4.)  Hymes-Esposito demands "that the excessive funding expended be disgorged or reimbursed."  (*Id.* at ¶ 10.)

Hymes-Esposito's allegations of conspiracy and extortion are vague and do not rise to the required level of specificity for such allegations.  Thus, to the extent, if any, that Hymes-Esposito intended to assert claims for conspiracy or extortion, these claims are dismissed.

### C.      Rule 11 Sanctions

Fleming, in addition, moves for sanctions against Hymes-Esposito and his attorney. Federal Rule of Civil Procedure 11, which governs sanctions, provides that courts may issue sanctions in certain, limited circumstances.  District courts have wide discretion in deciding when to order sanctions under Rule 11.  *Oliveri v. Thompson*, 803 F.2d 1265, 1280 (2d Cir. 1986).  Sanctions are appropriate under Rule 11 "where it is clear that: (1) a reasonable inquiry into the basis for a pleading has not been made; (2) under existing precedents there is no chance of success; and (3) no reasonable argument has been advanced to extend, modify or reverse the law as it stands."  *Int'l Shipping Co., S.A. v. Hydra Offshore, Inc.*, 875 F.2d 388, 390 (2d Cir. 1989).

Rule 11 sanctions are an extreme measure.  *See Ramashwar v. Espinoza*, No. 05 Civ. 2021, 2006 WL 36752, at *3 (S.D.N.Y. Jan. 6, 2006) ("Rule 11 sanctions are an extreme remedy, such that '[w]hen divining the point at which an argument turns from merely losing to losing *and* sanctionable . . . district courts [must] resolve all doubts in favor of the signer.'" (quoting *United States Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 455 (S.D.N.Y. 2004)) (alteration in original).  And they are not warranted here.  Indeed, the fact that the court is declining to dismiss one of Hymes-Esposito's allegedly sanctionable claims in itself militates strongly against imposing sanctions.  Thus, Fleming's motion for the imposition of Rule 11 Sanctions is denied.

## IV.    Conclusion

For the foregoing reasons, Hymes-Esposito's motion to dismiss the Complaint is GRANTED in part and DENIED in part.  Fleming's claims for fraud, tortious interference with contractual relations, tortious interference with prospective economic advantage, and intentional infliction of emotional distress are DISMISSED.

Fleming's motion to dismiss the counterclaims is GRANTED in part and DENIED in part.  Hymes-Esposito's claims for tortious interference with contractual rights, conspiracy, and extortion are DISMISSED.

Fleming's motion for the imposition of Rule 11 sanctions is DENIED.

The Clerk of the Court is directed to close the motions at docket entry numbers 12, 18, and 24.

SO ORDERED.

Dated:  New York, New York
        March 29, 2013

_____
J. PAUL OETKEN
United States District Judge